UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| CALVIN WILLIAMS, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14CV267 CDP |
| | ) | |
| NATIONAL CREDIT ADJUSTERS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

Calvin Williams obtained a $500 personal loan from Castle Payday Loans in April 2013. In August 2013, National Credit Adjusters, LLC ("NCA"), contacted Williams to collect on the debt. During the course of this collection effort, Williams and NCA set up a modified repayment plan, and NCA thereafter attempted to collect on the modified plan. In this action, Williams claims that the tactics used by NCA in its attempt to collect the debt violated the Missouri Merchandising Practices Act (MMPA) and the Federal Debt Collection Practices Act (FDCPA). NCA now moves for summary judgment on the claims. I will deny the motion.

The FDCPA prohibits debt collectors from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. The FDCPA also

prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt," 15 U.S.C. § 1692e; as well as the use of "unfair or unconscionable means" to collect a debt, 15 U.S.C. § 1692f. The MMPA makes unlawful "[t]he act, use or employment . . . of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.1. Under the MMPA, "[m]erchandise" includes "any objects, wares, goods, commodities, intangibles, real estate or services." Mo. Rev. Stat. § 407.010.4. The protections of the MMPA apply to loan collection practices inasmuch as such practices are "in connection with" the "sale" of a loan. *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 415-16 (Mo. banc 2014).

In this action, Williams claims that NCA violated the MMPA and FDCPA by misrepresenting its authority to resolve or collect on the original debt; engaging in threatening and harassing conduct in its communications regarding debt collection; continuing to contact him at work despite his request that such calls stop; attempting to directly contact him despite its knowledge that Williams was represented by legal counsel in relation to NCA's debt collection efforts; and failing to meaningfully disclose its identity when calling him after he filed this

lawsuit. NCA concedes that these acts would violate the law if they were true. It argues, however, that Williams fabricated the circumstances giving rise to these claims and that no reasonable jury could believe Williams' stories. Arguing that the issues of fact in this case are therefore not "genuine," NCA contends that it is entitled to judgment as a matter of law on Williams' claims. I am not convinced.

## SUMMARY JUDGMENT STANDARD

When considering a motion for summary judgment, I must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). As the moving party, defendant must establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e).

At the summary judgment stage, courts do not weigh the evidence and decide the truth of the matter, but rather determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. However, summary judgment may be appropriate "[w]hen opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it[.]" *Scott v. Harris*, 550 U.S. 372, 380 (2007). In such circumstances, the mere existence of some alleged factual dispute will not serve to defeat summary judgment; instead, the factual dispute must be "genuine." *Id.*

## BACKGROUND[1]

Plaintiff Calvin Williams obtained a personal loan from Castle Payday Loans in April 2013. NCA began collection efforts on the loan in August 2013.[2]

Victor Perez, an NCA collection agent, spoke with Williams on August 7, 2013, and explained that, given Williams' failure to pay on the loan, Castle Payday wanted to take a more aggressive approach to collect on the debt and sold Williams' account for collection.[3] Perez told Williams that $705 was owed on the loan.[4] Through a series of telephone calls between Williams and Perez that same date, arrangements were made for Williams to make installment payments totaling

---

[1] The facts set out herein are for purposes of summary judgment only. Nothing in this Memorandum and Order relieves any party of its burden of presenting evidence at trial.
[2] The record is unclear regarding the source of NCA's authority in August 2013 to collect on the debt. During a telephone call on August 7, NCA collection agent Victor Perez informed Williams that Castle Payday sold Williams' account for collection, and a letter dated August 8 informed Williams that NCA purchased the account and was now collecting on it. Deft. Exh. B-6 (disc), NCA 0087, Call 1; Exh. B.5. NCA's Compliance Officer ("CO") declares, however, that NCA did not purchase the account until January 2014; and, further, that at the time NCA began its collection efforts against Williams, it had leased the account from Castle Payday. Deft. Exh. B, Patnode Decl. at paras. 22, 24. None of the business records attached to the CO's Declaration identify Williams' Payday loan as one of the accounts either leased or sold to NCA.
[3] Deft. Exh. B-6 (disc), NCA 0087, Call 1. *See also* Exh. A, C. Wms. Depo. at 77.
[4] Deft. Exh. B-6 (disc), NCA 0089, Call 3. *See also* Exh. A, C. Wms. Depo. at 86-87. Williams contends that Perez informed him in an earlier unrecorded telephone conversation that there was an additional $200 fee associated with NCA taking over the collection efforts. NCA denies this contention.

a discounted amount of $605, which Perez represented would take care of the debt. Perez advised Williams that he would need to set up a new payment plan with NCA immediately in order to obtain the $100 discount.[5]

Perez and Williams exchanged numerous telephone calls regarding the status of the debt and setting up arrangements for Williams to pay it off.[6] Perez called Williams on his cell phone and on his workplace phone. Williams likewise called Perez from both his cell phone and from his workplace phone. On August 24, Perez informed Williams that a recent payment failed to go through and that he (Perez) would "unfortunately" have to make a "recommendation to proceed further with collection activity."[7] Perez advised Williams to provide updated debit/credit card information "real quick . . . in order to make sure we stop recourse."[8] Williams thereafter requested from "Mike," an NCA manager, that he be permitted to work with another collection agent given Perez's "pushy" nature of calling multiple times every day. Mike set up a new payment plan for Williams, but Perez continued as the agent on Williams' account.[9] Telephone calls thereafter continued between Williams and Perez. Williams successfully made a payment on his account in September 2013.[10] He did not make his scheduled payment in October

---

[5] Deft. Exh. B-6 (disc), NCA 0089, Call 3. *See also* Exh. A, C. Wms. Depo. at 88-92.
[6] Changes to Williams' payment plan were repeatedly made.
[7] Deft. Exh. B-6 (disc), NCA 0095, Call 9. *See also* Exh. A, C. Wms. Depo. at 113.
[8] *See supra* n.7.
[9] Deft. Exh. B-6 (disc), NCA 0096, Call 10. *See also* Exh. A, C. Wms. Depo. at 120-35.
[10] Deft. Exh. B-6 (disc), NCA 0115, Call 18. *See also* Exh. A, C. Wms. Depo at 203-10.

2013, and he continues to owe money related to the loan.[11]

Williams has presented evidence that beginning in October 2013 and continuing through February 2014, he received voicemail messages on his cell phone from persons identifying themselves as representatives of NCA, including calls from a person identifying himself as Victor Perez.[12] The caller ID on Williams' phone showed that the calls were from an "unknown" number.[13] Some of these calls were laced with profanity, racial slurs, threats of arrest and imprisonment for failure to pay on the debt, and threats in response to litigation. Beginning again in June 2014, Williams received voicemail messages on his cell phone from an unknown number. The messages were again profane and included vile racial slurs, but did not refer to Williams' debt.[14] Williams received other calls on his cell phone in June 2014 from telephone numbers identified through caller ID as being associated with NCA, but there were no voicemail messages from these calls.[15]

Williams contends that, following his receipt of the first inappropriate voicemail message, he instructed NCA during a telephone conversation to no longer call him at work. NCA denies that Williams gave any such oral instruction.

---

[11] Deft. Exh. A, C. Wms. Depo. at 28, 212.
[12] Deft. Exh. F (disc), "CalvinMessages."
[13] *Id. See also* Exhs. 9 & 10 to C. Wms. Depo. (Deft. Exh. E).
[14] Deft. Exh. F (disc), "CalvinMessages." *See also* Exhs. 9, 11-12 to C. Wms. Depo. (Deft. Exh. E).
[15] Exhs. 11-12 to C. Wms. Depo. (Deft. Exh. E).

Williams later instructed NCA by letter dated December 11, 2013, to not contact him at work.[16] Williams claims that he nevertheless continued to receive calls from NCA, and specifically, the calls described above.

NCA argues that the harassing and threatening voicemail messages were fabricated and orchestrated by Williams and were not originated by NCA or any of its employees, agents, or associates. As evidence, NCA points to audio recordings of three calls made in December 2013 and January 2014 that it contends originated from Williams' workplace and were directed to NCA during which unidentified persons requested or obtained the name of the NCA representative who answered the call.[17] NCA further contends that some of the offensive messages received by Williams occurred within minutes of these calls and were received on his cell phone from an unknown number.[18] The person(s) leaving these offensive messages identified themselves by the name of the NCA representative given in response to earlier calls from Williams' workplace.[19]

To the extent the caller who left some of these offensive messages identified himself as Victor Perez, NCA points to noticeable differences regarding the tone

---

[16] Pltf. Exh. 5.
[17] Deft. Exh. B-6 (disc), NCA 0110, NCA 0112, NCA 0113.
[18] *Compare* Exh. 10 to C. Wms. Depo. (Deft. Exh. E) *with* Deft. Exh. B, Patnode Decl. at paras. 56, 57. While NCA relies on its CO's September 2015 Declaration for the specific dates and times it received these calls from Williams' workplace, I note that the CO does not identify the records or other information from which she has this knowledge. I have reviewed the other records submitted by NCA for purposes of this motion and do not find any specific reference to the dates or times of these calls.
[19] Deft. Exh. F (disc), "CalvinMessages."

and quality of Perez's actual voice when compared to the voice attributed to him in these calls. NCA raises this same contention in relation to another NCA representative as well, Rachel Wilson-Banks. In addition to arguing that the voices are "obviously" dissimilar, NCA presents the reports of audio and voice comparison experts who have concluded there to be "probable elimination" between the voices – that is, that the voices attributed to Perez and Wilson-Banks in the offensive calls are not their true voices.[20]

To the extent that the caller ID feature on Williams' cell phone showed the offensive calls to originate from unknown numbers or from numbers associated with NCA, NCA contends that Williams was familiar with "spoofing" whereupon calling data is manipulated by a user to show a telephone call coming from a number other than the actual telephone number assigned to the device making the call. NCA also contends that Williams was familiar with other technology that permits a user to disguise his/her voice on telephone calls.[21] Finally, NCA has employed another expert who submitted a report regarding the unconventional method by which the offensive messages were stored on Williams' cell phone.[22]

NCA argues that the timing of the offensive calls, the dissimilarities between the known and unknown voices, the "unknown" numbers from which these calls

---

[20] Deft. Exhs. N & W, Koenig Decl.; Exh. N.1, Lab Report.
[21] Deft. Exh. G, A. Wms. Depo.
[22] Deft. Exh. R, Opata Decl.

originated, and Williams' knowledge regarding manipulating calling data shows that Williams fabricated the circumstances underlying his claims and that the offensive conduct cannot be attributed to NCA. NCA argues that the objective evidence of record – including telephone records from NCA's service provider, calls recorded by NCA, and expert reports – is contradicted only by Williams' stories, which lack evidentiary support. It is not for me, however, to decide these issues of fact on summary judgment.

## DISCUSSION

*"Genuine" Issues of Fact*

A "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam). Where witnesses on both sides come with their own perceptions, recollections, and even potential biases, genuine disputes are generally resolved by juries in our adversarial system. If I were to weigh the evidence and reach factual inferences contrary to Williams' evidence, I would neglect to adhere to the fundamental principle that at the summary judgment stage: reasonable inferences should be drawn in favor of the nonmoving party. *Id.* at 1868.

NCA urges me to apply the Supreme Court's reasoning in *Scott v. Harris* to the situation here. In *Scott*, the Supreme Court found that video footage of a police

chase conclusively demonstrated, contrary to the plaintiff's account of the event, that police had acted reasonably under the circumstances and had not committed a constitutional violation, thus entitling them to qualified immunity. 550 U.S. at 380-81. Indeed, the Supreme Court found the plaintiff's version of the facts to be "so utterly discredited" by the facts depicted on the videotape "that no reasonable jury could have believed" his claims. *Id.* at 380. As a result, the Supreme Court reversed the denial of summary judgment, holding that the lower court should not have relied on the plaintiff's "fiction[al]" statements, but instead, "it should have viewed the facts in the light depicted by the videotape." *Id.* at 380-81. This case does not present a situation similar to *Scott*.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Although NCA argues here that audio recordings and expert reports conclusively disprove Williams' account of the incidents in question, the evidence in this case is simply not as conclusive as the video in *Scott*. For instance, NCA has submitted various audio recordings in support of this motion, averring that all calls between handlers and debtors are recorded.[23] Other evidence shows, however, that recordings of calls lasting less

---

[23] *See* Memo. in Supp. of Mot., ECF #82 at p.11.

than forty-five seconds are automatically deleted after thirty days "[a]bsent orders to the contrary."[24] The calls of which Williams complains are all less than forty-five seconds. In addition, NCA asks me to credit their expert reports that the voices on some of the challenged calls are not the true voices of the identified NCA representatives, and further, that the authenticity of the offensive voicemails is questionable given the methods by which Williams saved them on his phone. Williams challenges the bases for these opinions. Factual disputes that may serve to discredit expert opinions prevent parties from obtaining summary judgment. These disputes are to be brought out at trial. *See Maze v. Regions Bank, Inc.,* 265 F.R.D. 465, 473 (E.D. Mo. 2009). *See also Gunning v. Cooley*, 281 U.S. 90, 94 (1930) (well settled that issues that depend upon the credibility of witnesses and the effect or weight of the evidence are to be decided by a jury); *Milprint, Inc. v. Donaldson Chocolate Co.*, 222 F.2d 898, 901-02 (8th Cir. 1955) (same); *Skrovig v. BNSF Ry. Co.*, 916 F. Supp. 2d 945, 973 (D.S.D. 2013) (same).

Simply put, while the evidence submitted to me raises questions about the validity and authenticity of the calls at issue, that is precisely the issue to be resolved. I am prohibited from making credibility judgments on a motion for summary judgment. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1075 (8th Cir. 2006) (citing *Yates v. Rexton, Inc.*, 267 F.3d 793, 800 (8th Cir. 2001)). The

---

[24] *See* Deft. Exh. B, Patnode Decl. at para. 15.

evidence before the Court does not "blatantly contradict" Williams' version of the events so completely that no reasonable jury could believe it. I conclude that the decision in *Scott* does not preclude Williams from pursuing his claims against NCA. *See Edwards v. Byrd*, 750 F.3d 728, 733 (8th Cir. 2014).

*Applicability of MMPA*

NCA also argues that, regardless of the factual disputes in the case, it is entitled to summary judgment on Williams' MMPA claim inasmuch as NCA's calls to Williams were made for the purpose of modifying the debt rather than collecting on the original Castle Payday loan. In his complaint – as well as in response to NCA's motion – Williams claims that the modified loan itself constituted a new sale to which the MMPA applies. NCA does not address this aspect of Williams' claim.

For purposes of the MMPA, "a loan is an agreed upon bundle of services being 'sold' by the lender to the borrower, and the 'sale' of a loan lasts until the last service is performed or the loan is repaid." *Conway,* 438 S.W.3d at 412. Allegations of deception in the course of those services are "in connection with" the "sale," even where the party committing the alleged deception is not the seller. *Id.* "As long as the plaintiff alleges that the misconduct occurred in connection with the services that comprise the 'sale' of a loan, the actor can be liable under the MMPA." *Id.* "Because a loan is an ongoing transaction, loan collection

procedures . . . are done 'in connection with' the original procurement of the loan." *Id.* at 416. To the extent Williams challenges NCA's conduct in its attempt to collect on the underlying Payday loan, including its authority to collect on the loan, *Conway* squarely places the claim under the MMPA.

Where parties negotiate for loan modification, however, the creation of a new agreement is contemplated rather than enforcement of the terms of the original loan. As such, actions related to loan modifications are not "in connection with" the sale of the original loan, and the MMPA does not apply to those actions – at least where a party bases its claim on the original loan. *Watson v. Wells Fargo Home Mortg., Inc.*, 438 S.W.3d 404, 408 (Mo. banc 2014). *See also Wivell v. Wells Fargo Bank, N.A.*, 773 F.3d 887, 899 (8th Cir. 2014). Here, the repayment terms of the Payday loan were modified through repeated negotiations between NCA and Williams. The renegotiation of these terms was not a service Castle Payday agreed to sell or Williams agreed to buy when they entered into the April 2013 loan agreement. As such, NCA was not enforcing the terms of the April 2013 loan when it modified the terms of repayment and the payment schedule. Therefore, its negotiations to modify the terms of the loan were not "in connection with" the April 2013 loan. *Wivell*, 773 F.3d at 899 n.2; *Geran v. Xerox Edu. Servs., Inc.*, ___ S.W.3d ___, No. WD 77507, 2015 WL 2392375, at *5 (Mo. Ct. App. May 19, 2015).

The story does not end there, however. NCA was successful in its negotiations with Williams to modify the terms of the loan, which resulted in substantial changes to the repayment plan, the schedule by which payments were to be made, the amounts to be paid incrementally, and the total amount required to satisfy the debt. Williams agreed to these modifications as demonstrated by his recorded statements – prompted by Perez – that he "agreed[d] to the payments and [would] make sure the money is available."[25] Williams claims that NCA's sale of this restructuring service was a separate sale under the MMPA, thereby bringing NCA's collection practices on this modified agreement within the purview of the MMPA. NCA does not challenge this contention. I may not grant summary judgment on an issue not raised in a movant's motion for summary judgment. *American Red Cross v. Community Blood Ctr. of the Ozarks*, 257 F.3d 859, 863 (8th Cir. 2001).[26]

"The use of an unlawful practice is a violation of the MMPA 'whether committed before, during or after the sale,' so long as it was made 'in connection

---

[25] *See* Deft. Exh. B-6 (disc), NCA 0089, Call 3; NCA 0099, Call 13; Exh. A, C. Wms. Depo. at 99, 154. Perez told Williams that these recorded statements were required for the file.

[26] No Missouri appellate court has had the opportunity to expressly address whether a *modified* loan agreement is a separate sale under the MMPA and thus whether conduct surrounding such an agreement is actionable. Although related arguments have been raised on appeal, the courts have not addressed them because of the claim's failure to be properly pled at the trial court level. *See*, *e.g., Watson*, 438 S.W.3d at 407 n.2 ("This Court offers no opinion as to whether these claims are actionable under the MMPA."); *Geran*, 2015 WL 2392375, at *6 ("appellate counsel did an excellent job arguing the claim on appeal," but the "petition did not allege that [defendant's] conduct occurred in connection with a new sale."). I do note, however, that in *Watson*, the Missouri Supreme Court suggested that plaintiffs amend their petition on remand to include these claims. *Watson*, 438 S.W.3d at 407 n.2.

with' the sale." *Conway*, 438 S.W.3d at 414 (quoting Mo. Rev. Stat. § 407.020.1). Williams claims that NCA engaged in unlawful conduct in connection with an independent sale, that is, the loan modification agreement; and that such unlawful conduct occurred during its negotiations with Williams to enter into the agreement and through its collection efforts thereon. As noted earlier, NCA does not challenge the applicability of the MMPA to the loan modification agreement to the extent Williams claims it is a new sale.

NCA's motion for summary judgment will be denied as to Williams' MMPA claims.

## CONCLUSION

On the information before the Court, and viewing all facts and inferences in the light most favorable to Williams, *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, I cannot say that NCA has established its right to judgment with such clarity as to leave no room for controversy and that Williams is not entitled to prevail under any discernable circumstances. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980).

Accordingly,

**IT IS HEREBY ORDERED** that defendant National Credit Association, LLC's Motion for Summary Judgment [ECF #81] is denied.

**IT IS FURTHER ORDERED** that defendant National Credit Association,

LLC's Motion Requesting Oral Argument on the motion [ECF #84] is denied.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 16th day of November, 2015.